**BINDER & SCHWARTZ LLP**
Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
366 Madison Avenue, 6th Floor
New York, New York 10017
Telephone: (212) 510-7008
Facsimile: (212) 510-7299

*Attorneys for the Motors Liquidation
Company Avoidance Action Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

In re:

MOTORS LIQUIDATION COMPANY, f/k/a
GENERAL MOTORS CORPORATION, *et al.*,

                                            Debtors.

------------------------------------------------------------------------x

MOTORS LIQUIDATION COMPANY AVOIDANCE
ACTION TRUST, by and through the Wilmington Trust
Company, solely in its capacity as Trust Administrator and
Trustee,

                                            Plaintiff,

                    against

JPMORGAN CHASE BANK, N.A., *et al*.,

                                            Defendants.

------------------------------------------------------------------------x

Chapter 11

Case No. 09-50026 (MG)
(Jointly Administered)

Adversary Proceeding

Case No. 09-00504 (MG)


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR LEAVE TO APPEAL PURSUANT TO 28 U.S.C. § 158(a)**
<u>**AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 8004**</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................ 4

I.      THE TERM LOAN.................................................................................................. 4

II.     OLD GM WAS FACING IMMINENT LIQUIDATION ................................... 4

III.    THE GENERAL MOTORS BANKRUPTCY ..................................................... 6

IV.   THE AVOIDANCE ACTION AND THE REPRESENTATIVE ASSETS TRIAL.......... 7

V.    THE BANKRUPTCY COURT'S OPINION ..................................................... 9

VI.   THE MEDIATION AND THE IMPORTANCE OF APPEAL ..................................... 10

QUESTION PRESENTED ............................................................................................... 11

LEGAL STANDARD...................................................................................................... 11

ARGUMENT .................................................................................................................. 12

I.      THE OPINION ADDRESSES A CONTROLLING QUESTION OF LAW ................. 12

II.     SUBSTANTIAL GROUNDS EXIST FOR DIFFERENCE OF OPINION ..................... 14

         A.    There is a Conflict of Authority Regarding the Correct Standard
              of Valuation for Old GM's Assets ........................................................ 14

         B.    The Correct Standard of Valuation of Old GM's Assets Presents
              a Difficult Question of First Impression ............................................. 15

         C.    There is Genuine Doubt as to Whether the Bankruptcy Court Applied
              the Correct Legal Standard ................................................................... 18

III.    INTERLOCUTORY REVIEW WILL MATERIALLY ADVANCE
         TERMINATION OF THE LITIGATION ..................................................... 22

IV.   EXCEPTIONAL CIRCUMSTANCES SUPPORT INTERLOCUTORY REVIEW....... 24

CONCLUSION................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Assocs. Commercial Corp. v. Rash*,
   520 U.S. 953 (1997).................................................................................... 16, 18

*Escondido Mission Village L.P. v. Best Prods. Co., Inc.*,
   137 B.R. 114 (S.D.N.Y. 1992)...................................................................... 12, 25

*Fed. Hous. Fin. Agency v. UBS Ams., Inc.*,
   858 F. Supp. 2d 306 (S.D.N.Y. 2012)..................................................... 13, 23, 25

*In re A2P SMS Antitrust Litig.*,
   No. 12-CV-2656 (AJN), 2015 WL 876456 (S.D.N.Y. Mar. 2, 2015) ...................... 12, 13, 18

*In re Duplan Corp.*,
   591 F.2d 139 (2d Cir. 1978)................................................................................ 13

*In re Enron Corp.*,
   No. 01-16034, 2006 WL 2548592 (S.D.N.Y. Sept. 5, 2006) .............................. 14, 18, 23, 25

*In re Enron Creditors Recovery Corp.*,
   No. 01-16034 (AJG), 2009 WL 3349471 (S.D.N.Y. Oct. 16, 2009)................... 12, 13, 16, 23

*In re Gen. Motors Corp.*,
   407 B.R. 463 (Bankr. S.D.N.Y. 2009).................................................... 4, 5, 19, 22

*In re Lehman Bros. Holdings Inc.*,
   No. 09-01242, 2010 WL 10078354 (S.D.N.Y. Sept. 23, 2010) ..................................... *passim*

*In re MacInnes*,
   235 B.R. 255 (S.D.N.Y. 1998)............................................................................. 12

*In re Motors Liquidation Co.*,
   482 B.R. 485 (Bankr. S.D.N.Y. 2012).................................................................. 15

*In re Motors Liquidation Co.*,
   No. 09-50026 (MG), 2017 WL 4280934 (Bankr. S.D.N.Y. Sept. 26, 2017)........................... 1

*In re Penn Centr. Transp. Co.*,
   384 F. Supp. 895 (Special Court 1974)................................................................. 21

*In re Residential Capital, LLC*,
   501 B.R. 549 (Bankr. S.D.N.Y. 2013).............................................................. 16, 19

*In re Trace Int'l Holdings, Inc.*,
   No. 04 Civ. 1295(KMW), 2009 WL 3398515 (S.D.N.Y. Oct. 21, 2009) ....................... 14, 16

*Matter of Valuation Proceedings Under Sections 303(c) and 306*
  *of Reg'l Rail Reorg. Act of 1973*,
  445 F. Supp. 994 (Special Ct. R.R.R.A. 1977) ........................................................ 20, 21, 22

*Matter of Valuation Proceedings under Sections 303(c) and 306*
  *of Reg'l Rail Reorg. Act of 1973*,
  531 F. Supp. 1191 (Special Ct. R.R.R.A. 1981) ................................................... 20

*McTigue v. Regal Cruises, Inc.*,
  No. 97 CIV. 7444(JSM), 1998 WL 289153 (S.D.N.Y. June 3, 1998) ............................. 14, 23

*Mirant Ams. Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors*
  *of Enron Corp.*,
  No. 02 Civ. 6274(GBD), 2003 WL 22327118 (S.D.N.Y. Oct. 10, 2003) ................. 12, 23, 25

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v.*
  *JPMorgan Chase Bank, N.A.*,
  486 B.R. 596 (Bankr. S.D.N.Y. 2013) ..................................................................... 7

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v.*
  *JPMorgan Chase Bank, N.A.*,
  755 F.3d 78 (2d Cir. 2014) ..................................................................................... 7

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v.*
  *JPMorgan Chase Bank, N.A.*,
  777 F.3d 100 (2d Cir. 2015) ................................................................................... 7

*Republic of Colombia v. Diageo N. Am. Inc.*,
  619 F. Supp. 2d 7 (E.D.N.Y. 2007) ....................................................................... 18

*Sterk v. Redbox Automated Retail, LLC*,
  672 F.3d 535 (7th Cir. 2012) ................................................................................ 23

*Till v. SCS Credit Corp.*,
  541 U.S. 465 (2004) ................................................................................... 16, 17, 19

*Urban Retail Props. v. Loews Cineplex Entm't Corp.*,
  01-cv-8946, 2002 WL 535479 (S.D.N.Y. Apr. 9, 2002) ................................................ 12, 14

*Wachovia Bank, N.A. v. Foster Bancshares, Inc.*,
  457 F.3d 619 (7th Cir. 2006) ................................................................................ 24

*Weber v. United States Tr.*,
  484 F.3d 154 (2d Cir. 2007) .................................................................................. 16

**Statutes**

11 U.S.C. § 363 (2017) ........................................................................................ 6, 16, 22

11 U.S.C. § 506 (2017) ............................................................................................. *passim*

28 U.S.C. § 1291 (2017) .................................................................................................. 24

28 U.S.C. § 1292 (2017) .............................................................................. 12, 14, 22, 24

**Other Authorities**

Fed. R. Bankr. P. 8004 .............................................................................................. 1, 25

S. Rep. No. 93-601 ........................................................................................................ 20

Plaintiff Motors Liquidation Company Avoidance Action Trust (the "Trust") respectfully submits this memorandum of law in support of its Motion pursuant to 28 U.S.C. § 158(a) and Federal Rule of Bankruptcy Procedure 8004 for Leave to Appeal from the Memorandum Opinion Regarding Fixture Classification and Valuation, entered by the United States Bankruptcy Court for the Southern District of New York on September 26, 2017 (the "Opinion") in the above-captioned adversary proceeding (the "Avoidance Action").[1]

## PRELIMINARY STATEMENT

The hallmark of the GM bankruptcy was the government-engineered bankruptcy sale of the failing company's assets to a government-sponsored entity in order to create "New GM." This historic government action was not motivated by commercial considerations, but by the objective of preventing catastrophic consequences to the automotive industry and the larger economy. No private entity would buy GM's assets to continue operating the company on a going-concern basis, and in the absence of the government bailout GM faced certain liquidation.

This action raises the question of how properly to value the collateral interest of secured lenders to "Old GM" in light of this unprecedented government intervention in the automotive industry. Defendants—lenders who years earlier had extended a $1.5 billion loan to GM, secured by collateral comprised of most of GM's manufacturing assets—were paid in full and ahead of other creditors in the bankruptcy proceedings, subject to the creditors' committee's right to file the instant action to challenge Defendants' entitlement to that payment. After years of litigation, the Second Circuit ruled that Defendants' security interest in most of the collateral securing the loan had become unperfected due to the filing of an erroneous UCC-3 termination statement, leaving Defendants with a surviving security interest in only "fixtures" (as defined

---

[1] The Opinion is attached as Exhibit A to the Declaration of Eric B. Fisher ("Fisher Decl."). It appears on Westlaw as *In re Motors Liquidation Co.*, No. 09-50026 (MG), 2017 WL 4280934 (Bankr. S.D.N.Y. Sept. 26, 2017).

under state law) at certain GM facilities.  This action seeks to recover the difference between the approximately $1.5 billion paid to Defendants in the bankruptcy proceedings and the value of their surviving security interest for the benefit of unsecured creditors, the United States Treasury, and Export Development Canada.

As part of the effort to determine the difference between what Defendants were paid and the value of their surviving security interest, the Bankruptcy Court held a representative trial to determine, among other issues, the correct methodology under Section 506(a) of the Bankruptcy Code for valuing forty (out of approximately 200,000) assets potentially included in Defendants' surviving collateral.  Section 506(a) requires assets to be valued in light of (a) the purpose of the valuation and (b) the assets' proposed disposition or use.  The Trust argued at trial that the proposed disposition was a sale, and, therefore, that pursuant to Supreme Court and other precedent, Section 506(a) required the assets to be valued at fair market value in the hands of the debtor, which is what GM could command for those assets in an open and competitive market. The Trust argued that the assets could not properly be valued in the hands of the subsidized purchaser (New GM) as part of a going concern business, because that going concern use was made possible only by the government's non-market, public policy subsidy.  Defendants, on the other hand, argued that going concern value in the hands of the entity created out of the government subsidy was the proper valuation methodology.

Although the Bankruptcy Court rejected Defendants' expert testimony as to how to determine the going concern value for the assets, the Bankruptcy Court agreed with Defendants that the assets should be valued on a going concern basis.  According to the Bankruptcy Court, the going concern values for the assets should be based on a report prepared by KPMG in connection with New GM's fresh start accounting.  Despite the Bankruptcy Court's clear

2

statement that the value of the government's "public policy subsidy" should *not* be included in valuing the assets under Section 506(a), that is precisely the error that it committed by adopting the KPMG going concern values for the assets.  Absent the government's "public policy subsidy," Old GM had no going concern value and it was, therefore, clear error for the Bankruptcy Court to adopt KPMG's going concern values to value the assets.

Interlocutory review of the Bankruptcy Court's opinion is warranted because the decision involves a controlling question of law, there is substantial ground for difference of opinion with respect to that question of law, and an appeal from the decision may materially advance the ultimate termination of the litigation.  First, the question of the proper construction of Section 506(a) is a primary dispute between the parties and raises a question of pure law that can be answered without extensive examination of the record.  Second, there is a conflict of authority with respect to this question, including a conflict with another decision *in the same GM bankruptcy proceeding* addressing essentially identical facts and legal issues.  The issue is also one of first impression in this circuit, and, as discussed below, there is genuine doubt as to whether the Bankruptcy Court applied the correct legal standard.  Third, interlocutory appeal will materially advance the termination of this litigation.  The Trust brings this motion to seek clarification of an issue that is vital to this case, and appellate review of this issue will expedite its ultimate resolution.  The Bankruptcy Court and parties have long operated with the understanding that following the representative trial, the parties will mediate with the goal of resolving this case.  The Trust is committed to proceeding with mediation scheduled for mid-December, but recognizes that if the parties are not able to resolve the case in that mediation due to differing views about the proper standard under Section 506(a), then the best way to further resolution is through an interlocutory appeal of this issue.

3

# BACKGROUND

## I.    THE TERM LOAN

In 2006, General Motors Company ("Old GM") obtained a secured term loan (the "Term Loan") of approximately $1.5 billion pursuant to an agreement among Old GM, Saturn Corporation, JPMorgan Chase Bank, N.A. ("JPMorgan") as administrative agent, and a syndicate of lenders. Op. at 7-8. The loan was secured by collateral that included equipment and fixtures at forty-two Old GM facilities throughout the United States. *See* Fisher Decl. Ex. B (Amended Joint Pretrial Order, Stipulated Facts ("JPTO") ¶ 47). To perfect the term lenders' security interests in the collateral, JPMorgan caused a UCC-1 financing statement (the "Delaware Financing Statement") to be filed with the Delaware Secretary of State, perfecting the lenders' interest in all equipment and fixtures at forty-two facilities owned by Old GM. *See* Op. at 7-8; JPTO ¶ 48. To ensure that the lenders had a first-priority lien on fixtures, JPMorgan also caused twenty-six financing statements (the "Fixture Filings") to be filed in counties where "Material Facilities"—defined as Old GM manufacturing facilities with collateral exceeding $100 million of net book value—were located. *See* Op. at 7. Interests in the Term Loan were ultimately assigned to more than 500 parties (the "Defendants"). *Id*. at 8.

## II.    OLD GM WAS FACING IMMINENT LIQUIDATION

In the years leading to its bankruptcy, Old GM was in a state of dramatic financial distress. *In re Gen. Motors Corp.*, 407 B.R. 463, 476 (Bankr. S.D.N.Y. 2009). It was facing a severe liquidity crisis, and its ability to continue operations was growing more uncertain with each passing day. *See id.* ("[Old] GM suffered a steep erosion in revenues, significant operating losses, and a dramatic loss of liquidity, putting its future in grave jeopardy."). Various factors—including significant structural costs, union restrictions, pension and healthcare obligations, an inefficient dealership network, and foreign competition—contributed to Old GM's decline, and

its financial performance and liquidity were further undermined by the economic recession. JPTO ¶¶ 5-8.  These mounting pressures left Old GM with a critical capital shortfall:  Its negative operating cash flows amounted to billions of dollars in 2008-2009, and in 2009 its liabilities exceeded its consolidated global assets by almost $100 billion.  Op. at 9-10.

To stave off imminent collapse, Old GM engaged in numerous unsuccessful attempts to secure private financing and raise capital, including secured debt and leveraged-loan offerings and the potential issuance of additional bonds and equity.  *Id.* at 10; JPTO ¶ 13.  Old GM also explored various strategic combinations with other automakers, most notably with Chrysler, but private lenders proved unwilling to provide the necessary liquidity, and, critically, Old GM determined that it was likely to burn through its own liquidity prior to consummation of the proposed merger transaction.  Op. at 10; JPTO ¶ 11.  By December 2008 there was absolutely no source of private financing available to Old GM.  *In re Gen. Motors*, 407 B.R. at 477; *see, e.g.*, JPTO ¶ 13; Fisher Decl. Ex. F (Wilson Decl. ¶ 8).

With working capital running precariously low, Old GM was forced to seek assistance from the lender of last resort, the U.S. Government (the "Government").  *See In re Gen. Motors*, 407 B.R. at 477 ("No party other than Treasury conveyed its willingness to loan funds to [Old] GM...."); JPTO ¶ 17.  The Government agreed to provide emergency funding, lending Old GM approximately $19.4 billion to sustain its operations between December 31, 2008 and the date of its bankruptcy filing.  Op. at 10-11; JPTO ¶¶ 20-27.  The Government made these funds available to Old GM on an emergency basis to avoid a chaotic "freefall" liquidation while Old GM developed a new business plan.  Fisher Decl. Ex. F ¶ 8.  This Government bailout was motivated by concern that the collapse of Old GM would cause significant harm to both the automobile industry and the larger United States economy, exacerbating the already serious

financial crisis.  Op. at 10; JPTO ¶ 19.  Through mid-2009, Old GM continued to pursue all

avenues of potential private funding, but to no avail.  *See* JPTO ¶ 13.  Ultimately, no private

actor was willing to purchase Old GM's assets and continue the company's operations.

## III.    THE GENERAL MOTORS BANKRUPTCY

On June 1, 2009 (the "Petition Date"), Old GM and certain of its subsidiaries filed

voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy

Court for the Southern District of New York (the "Bankruptcy Court").  Op. at 11; JPTO ¶ 31.

On the Petition Date, Old GM also filed a motion seeking approval to sell substantially all of its

assets to an entity sponsored by the Government—NGMCO, Inc. ("New GM")—in an expedited

sale under Section 363 of the Bankruptcy Code (the "363 Sale").  JPTO ¶¶ 32, 33.[2]  The sale to

New GM was approved by the Bankruptcy Court and closed on July 10, 2009.  *Id.* ¶¶ 42-43.

On June 25, 2009, in connection with its order approving debtor-in-possession financing

for Old GM (the "Final DIP Order"), the Bankruptcy Court authorized Old GM to pay

Defendants the full outstanding amount owed in principal and interest under the Term Loan

based on the understanding that Defendants were over-secured.  Fisher Decl. Ex. C (Final DIP

Order ¶ 19(a)).  On June 30, 2009, Defendants were paid in full and ahead of all other creditors.

Fisher Decl. Ex. D (Stipulation and Order Setting Valuation Date ¶ 1); JPTO ¶ 73.  However,

before entry of the Final DIP Order, the Official Committee of Unsecured Creditors of Old GM

(the "Committee") learned that on October 30, 2008, JPMorgan had authorized the filing of a

UCC-3 termination statement (the "Termination Statement") with the Delaware Secretary of

State, terminating the Delaware Financing Statement.  As a result, the Committee believed that

the Defendants may not have been fully secured as of the Petition Date.  *Official Comm. of*

---

[2] Whatever assets New GM did not acquire through the 363 Sale were to remain with Old GM.  JPTO ¶ 33.

*Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, 755 F.3d 78, 82 (2d Cir. 2014). The Bankruptcy Court authorized the Committee to institute an adversary proceeding to challenge the perfection of the Term Loan collateral. Fisher Decl. Ex. C ¶ 19(d).

## IV.    THE AVOIDANCE ACTION AND THE REPRESENTATIVE ASSETS TRIAL

The Committee filed this action on July 31, 2009, seeking to recover amounts overpaid to Defendants based on the mistaken assumption that their security interests were perfected and their claims fully secured. *See* Op. at 13-15. On March 1, 2013, the Bankruptcy Court held that the filing of the Termination Statement was ineffective and, therefore, that the security interest covered by the Delaware Financing Statement was perfected as of the Petition Date. *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, 486 B.R. 596, 647 (Bankr. S.D.N.Y. 2013). The Second Circuit ultimately reversed, holding that the Termination Statement was effective and terminated the Delaware Financing Statement, leaving in effect only the twenty-six Fixture Filings. *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, 777 F.3d 100, 105 (2d Cir. 2015); Op. at 14.

Following remand, the Trust replaced the Committee as plaintiff and commenced the second phase of the litigation to determine the extent and value of the security interest in collateral perfected by the twenty-six Fixture Filings (the "Surviving Collateral"). The key tasks in the second phase of the litigation involved identification of the assets comprising the Surviving Collateral and determination of the proper method for valuing that Surviving Collateral. Given that there were over 200,000 assets that might qualify as Surviving Collateral, the parties and the Bankruptcy Court recognized that a trial on all assets was virtually impossible. To facilitate a more efficient resolution, the Bankruptcy Court directed the parties to try a representative set of forty assets selected by the parties (the "Representative Assets"). *See* Fisher Decl. Ex. E (4/18/16 Hr'g Tr. 91:12-19).

The Bankruptcy Court undertook at the trial (the "Representative Assets Trial") to determine which of the Representative Assets were Surviving Collateral (including which were "fixtures" under state law) and the proper methodology for determining their value.[3]  The parties stipulated that the assets would be valued as of June 30, 2009, the date Defendants were paid, Fisher Decl. Ex. D, which was 10 days prior to the subsidized 363 Sale.  The parties conducted inspections of the three New GM plants where most of the Representative Assets were located, produced hundreds of thousands of pages of document discovery, conducted 34 fact depositions, and exchanged 24 expert reports concerning the Representative Assets and their value.

As the parties acknowledged, the valuation of the Representative Assets is governed by Section 506(a) of the Bankruptcy Code, which requires that assets be valued "in light of the purpose of the valuation and of the proposed disposition or use of such property."  11 U.S.C. § 506(a).  The parties agreed that the "proposed disposition" was a sale of all but two of the Representative Assets.  JPTO ¶ 19.  However, the parties disagreed on the premise of value that should be applied.  The Trust maintained that fair market value in the hands of the debtor, Old GM, is the controlling standard.  It argued that because Old GM had no going concern value as of June 30, 2009—all prepetition efforts to secure private financing and sell its operations or to merge with another automotive manufacturer failed, and there was no amount that any commercial market participant was willing to pay for Old GM's assets as part of a going concern—the only fair market value that Old GM could command for its assets, including the Representative Assets, was the amount it could receive in a liquidation.  The Government's willingness to inject additional funds into New GM—with the objective of sustaining New GM's

---

[3] The Court also addressed whether Defendants had a perfected security interest in the fixtures at the GM facilities at Lansing Delta Township and whether the Trust's challenge to that security interest was time-barred, whether Defendants had a perfected security interest in the fixtures at the GM Powertrain Pontiac Engineering facility, and whether Defendants had a perfected security interest in a particular asset (the "CUC") as of the valuation date.

8

operations and, more broadly, preserving the American auto industry—did not alter the value of

Old GM's assets in a fair market transaction as of June 30, 2009, and the fact that the

Representative Assets may have had greater value in the hands of New GM, an entity that

existed as a result of the Government's massive subsidy, is irrelevant under Section 506(a).

Accordingly, the Trust argued, liquidation is the proper premise of value.

Defendants argued that the assets should be valued based on the non-market "price" paid

by the Government in the 363 Sale or, in the alternative, their "in use" value to New GM.  In

support, Defendants argued that an accounting report (the "KPMG Report") prepared by KPMG

LLC for the Government-subsidized New GM, relating to New GM's post-bankruptcy fresh-start

accounting, provided a starting point for valuing the Representative Assets, but asserted that

significant modifications to KPMG's analysis that would increase the value of the assets must

also be applied.  The KPMG Report expressly applied an "in use" premise of value on the

understanding that New GM's assets would be used as part of a going-concern business

following the Government bailout, and it valued the assets as of the closing date of the 363 Sale

to New GM, July 10, 2009, 10 days after the parties' stipulated valuation date.  Op. at 153.

V.     **THE BANKRUPTCY COURT'S OPINION**

On September 26, 2017, the Bankruptcy Court issued its 196-page Opinion, which set

forth findings of fact and conclusions of law with respect to the Representative Assets and

guiding principles for the over 200,000 other assets.  The Bankruptcy Court declined to adopt the

valuation approaches advocated by the parties and instead fashioned its own valuation approach.

The Bankruptcy Court specifically rejected the Defendants' argument that the 363 Sale price

should guide the analysis, explaining that the sale price included a "Public Policy Subsidy" from

the Government in connection with the bailout not properly attributable to the value of the

Representative Assets.  Op. at 4, 147, 184.  The Bankruptcy Court likewise rejected the Trust's

argument that liquidation is the proper standard of value, holding instead that a "'going-concern in continued use' premise of value" is appropriate for assets purchased by New GM.  Op. at 4.  The Bankruptcy Court concluded that KPMG's valuation (without the upward modifications urged by Defendants) constitutes "the best available evidence of the assets' value."  Op. at 5.[4]  The Bankruptcy Court recognized that "KPMG valued *New GM's assets* 'as part of a going concern business,' a valuation premise known as 'value in use,'" Op. at 153 (emphasis added) (quoting the KPMG Report), but nevertheless held (with little analysis) that the KPMG valuation *excluded* the Government's public policy subsidy, Op. at 5, 184, 189, 194, notwithstanding that KPMG valued the assets in the hands of the beneficiary of that very subsidy, New GM, and that New GM would not have existed but for the Government subsidy.

The Bankruptcy Court made a significant error of law in holding that the Representative Assets should be valued "in use" as part of New GM as a going concern.  The holding is contrary to Section 506(a) and applicable case law, and will significantly impact the analysis of the value of the Surviving Collateral going forward in this case.  For the forty Representative Assets alone, the Bankruptcy Court's "in use" premise of value was tens of millions of dollars greater than the assets' liquidation value.  The decision affects the overwhelming majority of the over 200,000 disputed assets with implications across that pool of assets totaling hundreds of millions of dollars.

## VI.   THE MEDIATION AND THE IMPORTANCE OF APPEAL

The parties have agreed to participate in a two-day mediation in December 2017.  While the Trust is hopeful that the parties will reach resolution of this action at the mediation, in the absence of such a resolution, interlocutory appellate review of the valuation issue will be crucial

---

[4] KPMG valued only 33 of the 40 Representative Assets.  Additionally, the parties agreed not to present evidence on the value of one of the Representative Assets.  *See* Op. at Table A.

to resolving the case through further judicial proceedings or further mediation.  The valuation

issue is at the heart of the parties' dispute.  By clarifying the legal standard, which the Trust

understands will not likely be the subject of further consideration by the Bankruptcy Court, the

parties will be better situated to resolve this case without further judicial intervention.[5]  The

Bankruptcy Court and the parties acknowledge that trial of the remaining 200,000 assets would

be an extraordinary burden on judicial resources and the litigants.  Accordingly, if the upcoming

mediation should fail, it would be far more efficient and far less burdensome to litigate the

valuation question to final resolution than to plunge this case back into some form of asset-by-

asset litigation.  Appellate resolution of the valuation issue will provide necessary clarity and

finality regarding the single most critical issue remaining in the case and thus place the parties in

the best position to finally resolve the Avoidance Action.

## QUESTION PRESENTED

Under Section 506(a), where a debtor's assets are disposed of through a sale made

possible only by a government subsidy, should a secured creditor's interest in such assets be

valued based on the amount that the debtor would receive for the assets in a fair market

transaction, or the value of the assets to the government-sponsored acquirer as part of its going

concern business?

## LEGAL STANDARD

Appeals from a bankruptcy court's interlocutory orders may be taken with leave of the

court pursuant to 28 U.S.C. § 158(a).  *In re Lehman Bros. Holdings Inc.*, No. 09-01242, 2010

WL 10078354, at *6 (S.D.N.Y. Sept. 23, 2010).  To determine whether leave to appeal should be

---

[5] As the Bankruptcy Court explained: "It is impractical, to say the least, to litigate issues with respect to each of the over 200,000 disputed assets. . . .  The parties agreed that after the issuance of this Opinion, they would attempt to settle as to the remaining disputed assets. . . . Where possible, the Court has articulated broad principles of both fixture and valuation law to serve as guiding principles for the more than 200,000 assets that remain in dispute." Op. at 1-2.

granted, courts apply the standards prescribed under 28 U.S.C. § 1292(b).  *Id.*; *see also In re MacInnes*, 235 B.R. 255, 263 (S.D.N.Y. 1998) ("The majority of courts in this district have applied the standard set forth in 28 U.S.C. § 1292(b) in the context of appeals from bankruptcy courts. . . .").  Under this three-pronged test, interlocutory review is warranted if (1) the challenged order "involves a controlling question of law," (2) over which there is "substantial ground for difference of opinion," and (3) an appeal from the order may "materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b); *see also Urban Retail Props. v. Loews Cineplex Entm't Corp.*, 01-cv-8946, 2002 WL 535479, at *4 (S.D.N.Y. Apr. 9, 2002).  Even where the three-pronged test is not satisfied, leave for appeal may be granted if the court determines that "exceptional circumstances" otherwise justify interlocutory review.  *See Mirant Ams. Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of Enron Corp.*, No. 02 Civ. 6274 (GBD), 2003 WL 22327118, at *2 (S.D.N.Y. Oct. 10, 2003); *Escondido Mission Village L.P. v. Best Prods. Co., Inc.*, 137 B.R. 114, 116-17 (S.D.N.Y. 1992).

## ARGUMENT

The Trust respectfully submits that the Court should exercise its discretion to grant leave to appeal under 28 U.S.C. § 158(a), because, as set forth below, each of the three Section 1292(b) factors is satisfied and exceptional circumstances favor interlocutory review.

## I.  THE OPINION ADDRESSES A CONTROLLING QUESTION OF LAW

Interlocutory review is available where the bankruptcy court order involves a "controlling question of law."  A "controlling question of law" is one that a reviewing court could decide "quickly and cleanly without having to study the record," *In re A2P SMS Antitrust Litig.*, No. 12-CV-2656 (AJN), 2015 WL 876456, at *4 (S.D.N.Y. Mar. 2, 2015), the determination of which would "materially affect the outcome of the litigation." *In re Enron Creditors Recovery Corp.*, No. 01-16034 (AJG), 2009 WL 3349471, at *5 (S.D.N.Y. Oct. 16, 2009) (quotations and citation

omitted); *see also Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 337 (S.D.N.Y. 2012) ("[I]t is enough to satisfy the statute's first prong that the issue is one 'that may importantly affect the conduct of [the] action.'") (quoting *In re Duplan Corp.*, 591 F.2d 139, 148 n.11 (2d Cir. 1978)).  Both conditions are met by the valuation question presented here.

The core valuation dispute in this adversary proceeding turns on one threshold, outcome-critical question of controlling law: What is the appropriate standard for valuing a creditor's secured interest in a debtor's assets under Section 506(a), where those assets are purchased pursuant to a government-subsidized bailout premised on public policy concerns?  The Trust maintains that the value of the assets must be determined, as a matter of law, by their fair market value in the hands of the debtor, Old GM.  Defendants, conversely, urge reliance on a third-party assessment of the value of the assets in the hands of their ultimate purchaser, New GM.

This first-order disagreement over the correct valuation approach is at the heart of what the Bankruptcy Court characterized as the "primary dispute between the parties," Op. at 146, and its resolution on appeal could be decisive, with hundreds of millions of dollars potentially at stake.  The question is, moreover, one of pure law, for it addresses a matter of statutory interpretation—the proper construction of Section 506(a), as clarified by the United States Supreme Court—and can be answered without extensive examination of the record.  *In re A2P SMS Antitrust Litig.*, 2015 WL 876456, at *4; *see also Enron Creditors Recovery*, 2009 WL 3349471, at *6 ("[M]atters of statutory interpretation present questions of law, not of fact. . . .").  Because this valuation issue presents a controlling question of law that would materially affect resolution of the litigation, it is appropriately resolved through interlocutory appeal.  *See Enron Creditors Recovery*, 2009 WL 3349471, at *5.

## II.     SUBSTANTIAL GROUNDS EXIST FOR DIFFERENCE OF OPINION

Interlocutory review is additionally warranted here because there is "substantial ground for difference of opinion" as to whether the Bankruptcy Court applied the correct valuation standard.  28 U.S.C. § 1292(b).  A "substantial ground for difference of opinion" exists where there is "genuine doubt as to whether the Bankruptcy Court applied the correct legal standard." *In re Enron Corp.*, No. 01-16034, 2006 WL 2548592, at *4 (S.D.N.Y. Sept. 5, 2006).  Such doubt may arise where, for example, there is "conflicting authority on the issue" or where the order involves a "difficult question of first impression" in the Second Circuit.  *In re Lehman Bros. Holdings Inc.*, 2010 WL 10078354, at **6-7; *see also In re Trace Int'l Holdings, Inc.*, No. 04 Civ. 1295 (KMW), 2009 WL 3398515, at *3 (S.D.N.Y. Oct. 21, 2009).  Either consideration is independently sufficient to establish a "substantial ground for difference of opinion"; here, both criteria are met.

### A.     There is a Conflict of Authority Regarding the Correct Standard of Valuation for Old GM's Assets

As an initial matter, there is a conspicuous conflict of authority with respect to the specific valuation question at issue here.  Indeed, the judge who previously presided over the GM bankruptcy, presented with essentially the *same* valuation question and the *same* facts in the same GM bankruptcy, came to a different conclusion as to the standard for valuing the assets of Old GM.  This divergence demonstrates "substantial ground for difference of opinion."  *See Urban Retail Props*, 2002 WL 535479, at *5 (substantial ground for difference of opinion given "split of authority" and lack of definitive Second Circuit guidance); *McTigue v. Regal Cruises, Inc.*, No. 97 CIV. 7444 (JSM), 1998 WL 289153, at *1 (S.D.N.Y. June 3, 1998) (disagreement among courts "clearly" establishes "substantial ground for a difference of opinion").

14

In its decision in *In re Motors Liquidation Co.* ("*TPC*"), 482 B.R. 485 (Bankr. S.D.N.Y. 2012), the Bankruptcy Court addressed essentially the same valuation question and similar facts as in the Opinion, but arrived at a different result.  In *TPC*, as here, the Bankruptcy Court was tasked with applying Section 506(a) to the valuation of certain Old GM secured collateral sold to New GM via the Government-subsidized 363 Sale.  The secured creditors in *TPC* advocated "value in use" in the hands of New GM as the governing standard of value, while New GM countered that the fair market value of the assets should control.  *TPC*, 482 B.R. at 486, 493-94. Bankruptcy Judge Gerber squarely rejected the "value in use" standard proposed by the secured creditors, adopting instead fair market value as the appropriate standard, explaining that "value in use" was not an appropriate measure of value where the collateral was not retained by the debtor but was the subject of the 363 Sale.  *Id.* at 494-95.  The Opinion, without discussing or even acknowledging *TPC*, inverts its holding.  Though confronted with the same bankruptcy, the same debtor, the same 363 Sale, the same task of valuing Old GM's assets subject to a security interest, the Bankruptcy Court here rejected the market value standard advocated by the Trust and instead adopted KPMG's "value in use" appraisal of the assets in New GM's hands.  Op. 151-52, 153, 194.  That two bankruptcy judges in the same bankruptcy have come to such divergent conclusions on essentially the same valuation question—one rejecting "value in use," the other embracing it—demonstrates that "substantial ground for difference of opinion" exists with respect to the correct standard for valuing Old GM's assets.

### B.   The Correct Standard of Valuation of Old GM's Assets Presents a Difficult Question of First Impression

A "substantial ground for difference of opinion" has also been found where a disputed issue poses a challenging legal question of first impression.  *See In re Lehman Bros. Holdings Inc.*, 2010 WL 10078354, at *7; *see also Weber v. United States Tr.*, 484 F.3d 154, 159 (2d Cir.

2007) (explaining that Congress passed Section 1292(b) "to assure the prompt resolution of knotty legal problems").  Indeed, "[w]hen a controlling question of law presents an issue of first impression, permission to appeal is often granted."  *Enron Creditors Recovery*, 2009 WL 3349471, at *6, *7 ("[A]ny issue of first impression can give rise to a substantial ground for a difference of opinion."); *see also In re Trace Int'l Holdings, Inc.*, 2009 WL 3398515, at *3 (interlocutory review appropriate on "difficult issue of apparent first impression").

Here, the Bankruptcy Court was asked to address a manifestly difficult legal question that has never been definitively addressed by the Second Circuit Court of Appeals:  The proper application of Section 506(a) in the context of a government-subsidized sale of a debtor's assets. Section 506(a) provides, in pertinent part, that the value of a secured creditor's interest in a debtor's property must be "determined in light of the purpose of the valuation and of the proposed disposition or use of such property."  11 U.S.C. § 506(a)(1) (2016).  There is no dispute that the "proposed disposition" of all but two of the Representative Assets was a sale, but this is not the end of the analysis, for a creditor's secured interest must be valued in the hands of the debtor.  *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 963 (1997); *see also Till v. SCS Credit Corp.*, 541 U.S. 465, 476 n.13 (2004) (stating that *Rash* held that a "creditor's secured interest should be valued from the debtor's, rather than the creditor's, perspective"); *In re Residential Capital, LLC*, 501 B.R. 549, 595 (Bankr. S.D.N.Y. 2013) ("*ResCap*") ("[T]he Court must apply that value [of the collateral] based on the proposed disposition of the collateral—fair market value *in the hands of the Debtors*." (emphasis added)).  The Supreme Court's directive in *Rash* takes on special importance here, due to the unique situation of the debtor, Old GM.

At issue in *Rash* was the appropriate standard under Section 506(a) for valuing a truck pledged as collateral on an outstanding loan.  520 U.S. at 955-56.  The debtors urged the

16

application of foreclosure value, the amount the creditor would obtain if it "exercised its right to repossess and sell the truck." *Id*. at 957-58.  The Supreme Court disagreed, holding that replacement value—the "price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition"—better captured the value of the collateral from the perspective of the debtors, who proposed to retain the truck for their own continued use. *Id*. at 959 n.2, 963, 965.  The lesson of *Rash* is that the value of an asset *to the debtor*, not the creditor, governs Section 506(a) analysis. *Id*. at 963; *Till*, 541 U.S. at 476 n.13.

Although the collateral in *Rash* was to be retained by the debtor, applying *Rash* in the context of a sale ordinarily poses no difficulty.  Where the proposed disposition of a debtor's assets is the sale of those assets, their value to the debtor may typically be measured by their fair market value, which under most circumstances will be reliably reflected in their actual sale price. What makes the instant case different is that the 363 Sale was no ordinary sale.  As the Bankruptcy Court underscored, the sale of Old GM's assets was an "extraordinary transaction in nearly every way," and the Government's intervention was "in many ways unprecedented."  Op. at 192.  There was no market for Old GM's assets on a going-concern basis and "no private market participant . . . willing to make a deal with Old GM," *id*. at 10, so the Government was compelled to intervene to avert what it feared would be a disaster for the American automobile industry and for the broader economy.

In light of the unique circumstances of the 363 Sale and the public policy motivations compelling the Government's intervention, the valuation question at the core of this proceeding is largely uncharted.  Because the 363 Sale was an emergency government bailout structured as a sale, driven not by commercial considerations but by overriding public policy imperatives, the "price" paid by the Government, as the Bankruptcy Court recognized, was not reflective of the

market value of Old GM's assets.  *Id.* at 147, 149, 151 (noting "absence of a fair market sale

price"), 184.  Moreover, the impact of the Government subsidy takes on critical importance

under *Rash*, for the value of the assets in the hands of Old GM—a doomed business unable to

find a buyer—cannot reasonably be equated with the value of those same assets in the hands of

New GM—a government-sponsored business with viable prospects as a going concern.  Both the

363 Sale and the Government subsidy that made it possible thus raise novel legal questions of

significant import for which there is no controlling Second Circuit authority and, indeed, few

relevant guideposts in any existing case law.  *See Republic of Colombia v. Diageo N. Am. Inc.*,

619 F. Supp. 2d 7, 11 (E.D.N.Y. 2007) (interlocutory review appropriate where court's decision

implicated "significant legal and policy concerns" not addressed by pertinent case law).  This

itself is "enough to establish substantial ground for difference of opinion."  *In re Lehman Bros.*

*Holdings Inc.*, 2010 WL 10078354, at *7; *see also Diageo N. Am. Inc.*, 619 F. Supp. 2d at 11

(prong met given "novelty and complexity of the issues presented").

## C.      There is Genuine Doubt as to Whether the Bankruptcy Court Applied the Correct Legal Standard

There is, moreover, "genuine doubt as to whether the Bankruptcy Court applied the

correct legal standard."  *In re Enron Corp.*, 2006 WL 2548592, at *4; *see also In re A2P SMS*

*Antitrust Litig.*, 2015 WL 876456, at *3 (substantial ground for disagreement exists where there

are "compelling arguments contrary" to challenged ruling).  The Opinion ignores well-

established principles of valuation set forth by the Supreme Court and by lower courts in this

Circuit and, as discussed above, takes no account of Judge Gerber's analysis of essentially the

same valuation question raised in the same bankruptcy proceeding.

The Supreme Court instructs that the value of a creditor's secured interest under Section

506(a) must be assessed from the perspective of the debtor.  *Rash*, 520 U.S. at 963; *see also Till*,

541 U.S. at 476 n.13; *ResCap*, 501 B.R. at 595.  Accordingly, courts must consider factors specific to a debtor's circumstances that may prevent the debtor from "captur[ing] fair value for its assets." *ResCap*, 501 B.R. at 596.  For this reason, the assets of a distressed company on the "brink of insolvency" cannot be assessed on the basis of the "fair market value of the assets in the hands of a solvent company." *Id*.

The Opinion overlooked this guidance and in fact turned it on its head, concluding that the Representative Assets should be valued not from the perspective of the debtor, Old GM, but from the perspective of the government-sponsored New GM, a separate legal entity.  The Opinion thus adopted KPMG's valuation as the best available measure of value for the Representative Assets, Op. at 5, 147, notwithstanding that KPMG's task was to provide a post-bankruptcy valuation of *New GM* and its assets, based on *New GM's* projected future cash flows and *New GM's* prospective viability as a going concern.  *Id*. at 152-63.  This distinction makes all the difference, for in valuing New GM's assets KPMG applied a "value in use" premise on the understanding that New GM—fueled by a massive infusion of government funds—could credibly be regarded as a "going concern business." *Id.* at 153.  But the same premise would not and could not apply to the assets in the hands of *Old GM*, a terminally failing business which, absent the government-sponsored 363 Sale, would have had no option but to liquidate.  *See In re Gen. Motors*, 407 B.R. at 493 ("[T]he only alternative to an immediate sale is liquidation.").[6]  By adopting a valuation of the Representative Assets in the hands of New GM, the Opinion departed not only from binding Supreme Court precedent but also from prior decisions of the Bankruptcy

---

[6] The Bankruptcy Court incorrectly concluded that KPMG's valuation methodology excluded the Government subsidy.  *See* Op. at 184, 189, 194.  In fact, KPMG's going concern valuation of New GM necessarily incorporated the Government subsidy; it was only by virtue of that subsidy that New GM was able to operate as a going concern. *See, e.g.*, Fisher Decl. Ex. G (Feldman Dep. 159:20-160:22) (The Government believed that Old GM would liquidate if the 363 Sale did not go forward).  Indeed, no "going concern" valuation of the Representative Assets can fairly be said to exclude the "Public Policy Subsidy," because New GM's going concern status was dependent on it.

Courts of the Southern District of New York, with the result that the assets of Old GM have been dramatically overvalued by the Bankruptcy Court.

The Bankruptcy Court erred further by misconstruing the Special Court's decision in *Matter of Valuation Proceedings Under Sections 303(c) and 306 of Reg'l Rail Reorg. Act of 1973*, 445 F. Supp. 994 (Special Ct. R.R.R.A. 1977) (Friendly, P.J.) ("*Reg'l Rail*"). The *Reg'l Rail* decision is pivotal here, because the valuation question confronted by the Special Court is so directly analogous to the question presented by this action. Specifically, the *Reg'l Rail* court was charged with determining the value of assets acquired from bankrupt railroad companies as part of a government-sponsored program to preserve the regional rail industry from imminent collapse. There, as here, the asset acquisitions were driven by public policy imperatives rather than market considerations, and there, as here, it was only the intervention of the government that made continued operation of the assets possible. *See Reg'l Rail*, 445 F. Supp. at 1011 n.22; *see also* S. Rep. No. 93-601, *reprinted in* 1973 U.S.C.C.A.N. 3242, 3242-49 (1973). Thus, the question before the Special Court closely parallels the issue to be decided here: How to value the assets of a failing business enterprise where such assets are acquired by a government-subsidized entity as part of the public bailout of a vital American industry?

The Special Court came to two conclusions of key relevance. First, the Special Court held that the value of the rail assets was not to be measured by their value to the government or to the government-sponsored entity that put the assets to continued use; rather, the determinative value was the value that the failing railroad companies themselves would have been able to obtain for the assets had the government not intervened. *Id*. at 1014, 1016; Op. at 149-50; *see also Matter of Valuation Proceedings under Sections 303(c) and 306 of Reg'l Rail Reorg. Act of 1973*, 531 F. Supp. 1191, 1210 (Special Ct. R.R.R.A. 1981) ("[T]he [transferors] are entitled to

compensation for the properties conveyed by them . . . for whatever they could have realized for them *in the absence of the Rail Act*." (emphasis added)).  From this first conclusion flowed a second:  The Special Court held that going concern value could not properly be ascribed to the rail assets inasmuch as the railroad companies were themselves not going concerns, but were in fact "hopelessly losing" and "destined to remain so."  *Reg'l Rail*, 445 F. Supp. at 1011, 1015, 1037 n.54 (transferors not "entitled to an allowance for the 'going concern' value of their properties").  Crucially, that the rail assets would be put to continued use by a government-sponsored entity following the bailout did not change the Special Court's analysis, for such continued use in the hands of another entity did not invest the assets with any going concern value from the point of view of the failing railroad companies.  *Id*. at 1037 n.54.

The Bankruptcy Court here recognized the relevance of the *Reg'l Rail* decision, Op. at 149, but misconstrued one of its key holdings.  In particular, the Opinion misreads *Reg'l Rail* as having rejected going concern value in favor of liquidation value because the rail assets were "being condemned, not continuing as part of a profitable, ongoing business."  *Id*. at 150, 186. This is a critical misunderstanding.  Condemnation is of course not inconsistent with continuing use, and the Special Court in fact acknowledged that the rail assets at issue there, like Old GM's assets here, would be put to continuing use.  *Reg'l Rail*, 445 F. Supp. at 1030, 1041 ("condemned rail properties have been taken *for continued rail use*") (emphasis added).[7]  Indeed, the acquiring entity was a government-sponsored, for-profit corporation created for the very purpose of putting the rail assets to continued use.  *In re Penn Centr. Transp. Co.*, 384 F. Supp. 895, 906 (Special Ct. R.R.R.A. 1974).  Contrary to the Opinion's understanding, the Special Court rejected going

---

[7] Condemnation is the "determination and declaration that certain property (esp. land) is assigned to public use, subject to reasonable compensation."  Black's Law Dictionary (10th ed. 2014).

concern value in *Reg'l Rail* not because the rail assets were not intended for continued use as part of an ongoing business (they were) but because the rail assets had no going concern value *in the hands of their original owners*.  445 F. Supp. at 1037 n.54.[8]

The lessons of *Reg'l Rail* are directly applicable here:  Under *Reg'l Rail*, the value of the Representative Assets must be based not on their value in the hands of the government-subsidized New GM, but on whatever value Old GM would have been able to obtain for the assets on the open market in the absence of government intervention.  *Id.* at 1013-16, 1029 n.46.[9] The Representative Assets had no going concern value in the hands of Old GM, because, like the railroads at issue in *Reg'l Rail*, Old GM was not a going concern.  *See In re Gen. Motors*, 407 B.R. at 492 n.54 (it was a "certainty or near certainty" that, absent government intervention, the "patient will indeed die on the operating table").  That *New GM*, a freshly created business entity sustained by an enormous government subsidy, was able to put many of the Representative Assets to use, does not mean that any going concern value can be ascribed to those assets in the hands of Old GM, and *Reg'l Rail* supports this conclusion.

## III.   INTERLOCUTORY REVIEW WILL MATERIALLY ADVANCE TERMINATION OF THE LITIGATION

The third prong of the 28 U.S.C. § 1292(b) test is satisfied where interlocutory appeal "may materially advance the ultimate termination of the litigation."  Courts "place particular

---

[8] The Opinion cites *Reg'l Rail* for the proposition that going concern valuation may be appropriate with respect to "property taken from a company that continued in business."  Op. at 150 (quoting *Reg'l Rail*, 445 F. Supp. at 1037 n.54), 186.  This *dictum* is inapposite, because Old GM was not a "company that continued in business."  To the contrary, Old GM, like the railroad companies in *Reg'l Rail*, ceased operations, and its assets, like the assets at issue in *Reg'l Rail*, were put to continued use by a distinct, government-sponsored entity.

[9] The Opinion rejected as impermissibly "counterfactual" or "hypothetical" any effort to assess the value of Old GM's assets on the assumption that the Section 363 sale had not occurred.  *See* Op. at 4, 187-88.  There is nothing counterfactual about this approach.  The issue is what measure of value to use.  By the Bankruptcy Court's own account, the *Reg'l Rail* decision mandates this approach: "The Special Court held that the condemned rail assets were to be valued not on the basis of their value to the U.S. Government, but on their value in the absence of the government's intervention."  *Id.* at 149-50.

emphasis on the importance of this last factor," *In re Enron Corp.*, 2006 WL 2548592, at *4, and applications for leave to appeal "should be liberally granted" if interlocutory review may "facilitate the expeditious resolution of the case." *Enron Creditors Recovery*, 2009 WL 3349471, at *7; *see also In re Johns-Manville Corp.*, 45 B.R. 833, 835 (S.D.N.Y. 1984).

The test is satisfied here, because District Court review of the Opinion is likely to expedite the ultimate resolution of this adversary proceeding. *See In re Lehman Bros. Holdings Inc.*, 2010 WL 10078354, at *8. If first-round mediation efforts scheduled for December prove unsuccessful, final resolution of the valuation question through interlocutory review will significantly facilitate further negotiations and will likely lay the necessary groundwork for a final settlement. *See Fed. Hous. Fin. Agency*, 858 F. Supp. 2d at 338 (interlocutory review "likely to significantly affect the parties' bargaining positions and may hasten the termination of this litigation through settlement"); *see also Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536-37 (7th Cir. 2012) (granting interlocutory review where, *inter alia*, "uncertainty" over contested issue "may delay settlement" and "further protract the litigation"); *McTigue*, 1998 WL 289153, at *1 (granting leave where defendant was unlikely to settle prior to appellate review of contested issue). Because the parties are far less likely to reach a final settlement while a controlling and vigorously disputed question of law remains in doubt, deferring review of the Opinion until final judicial resolution of the case (which the parties and Bankruptcy Court agree is a herculean task that should be prevented if possible) would present a significant roadblock for settlement negotiations. *See Fed. Hous. Fin. Agency*, 858 F. Supp. 2d at 338 (review may streamline litigation by "remov[ing] a cloud of legal uncertainty"); *Mirant Ams. Energy Mktg.*, 2003 WL 22327118, at *2 ("It would be inefficient to have the parties proceed under the status quo and await a final order before this Court reviewed appellant's motion.").

## IV.    EXCEPTIONAL CIRCUMSTANCES SUPPORT INTERLOCUTORY REVIEW

For the reasons set forth above, interlocutory review of the Opinion is proper pursuant to Section 1292(b).  Moreover, the exceptional circumstances of the Avoidance Action and the Representative Assets Trial provides an alternative, independent basis for interlocutory appeal.

As the Opinion and the parties acknowledge, there is no easy means of adjudicating each of the 200,000 plus assets remaining in dispute.  Op. at 2 n.2, 6 ("[I]ndividual appraisal of over 200,000 assets is simply not feasible.").  Discovery concerning just forty Representative Assets was extensive and resource-intensive; to litigate over 200,000 remaining assets in this fashion would likely impose a considerable burden on the courts, the parties, and third parties.  For this reason, the Opinion set forth broad, guiding principles of law that were intended to be applied to the remaining disputed assets.  *Id*. at 2.  As such, the Opinion functions in this proceeding very much like a declaratory judgment order of the sort that would be appealable as of right. *Wachovia Bank, N.A. v. Foster Bancshares, Inc.*, 457 F.3d 619, 621 (7th Cir. 2006) ("A judgment that declares rights but does not order relief is appealable under 28 U.S.C. § 1291 as, and only as, a declaratory judgment.").  There is, moreover, little doubt that the Opinion represents the Bankruptcy Court's final pronouncement on the valuation question; there is not anticipated to be a more final order with respect to the principles governing valuation.  *See id*.

Should the parties prove unable to resolve their dispute at the December mediation, any prospects for meaningful forward progress will be much diminished without a final determination of the key valuation issues litigated at the Representative Assets Trial.  As discussed above, because the valuation principles articulated in the Opinion apply across all the disputed assets, resolution of the question will significantly narrow the parties' disputes and place the parties in the best position to achieve a final settlement with respect to the full universe

24

of disputed assets.  *See Fed. Hous. Fin. Agency,* 858 F. Supp. 2d at 338.[10]  Accordingly, it would not promote the efficiency of this litigation to require the parties to wait indefinitely for a more final order from the Bankruptcy Court.  Under these extraordinary circumstances, deferring review of the Opinion is likely to protract, rather than advance, the resolution of this litigation, and, accordingly, interlocutory review of the Opinion would be warranted even if the Section 1292(b) test had not been satisfied.  *See Escondido Mission Village L.P.*, 137 B.R. at 116-17 (S.D.N.Y. 1992) (granting leave to appeal due to "exceptional circumstances," notwithstanding movant's failure to satisfy Section 1292(b)); *see also Mirant Ams. Energy Mktg., L.P.*, 2003 WL 22327118, at *2.

## CONCLUSION

For the foregoing reasons, the Trust respectfully requests that the Court grant leave to appeal the Opinion pursuant to 28 U.S.C. § 158(a) and Fed. R. Bankr. P. 8004.

Dated:   October 10, 2017                    Respectfully submitted,
       New York, New York

**BINDER & SCHWARTZ LLP**

/s/ Eric B. Fisher
Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
M. Tomas Murphy
Tessa B. Harvey
366 Madison Avenue, 6th Floor
New York, New York 10017
Tel: (212) 510-7008
Facsimile: (212) 510-7008

*Attorneys for the Motors Liquidation
Company Avoidance Action Trust*

---

[10] The possibility of successful mediation does not obviate the need for review; it is an additional factor in favor of it.  In *In re Enron Corp.*, plaintiff argued that leave for interlocutory appeal was inappropriate because, *inter alia*, prospective settlements might render review unnecessary.  2006 WL 2548592, at *4.  The court rejected this, explaining that "it is precisely the risk that these orders will go unreviewed that makes this an exceptional case." *Id.*